# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ELI LILLY AND COMPANY, *et al.*, | |
| *Plaintiffs*, | |
| v. | Case No. 24-CV-3220 (DLF) |
| ROBERT F. KENNEDY JR., *et al.*, | |
| *Defendants*. | |
| BRISTOL MYERS SQUIBB COMPANY, | |
| *Plaintiff*, | |
| v. | Case No. 24-CV-3337 (DLF) |
| ROBERT F. KENNEDY JR., *et al.*, | |
| *Defendants*. | |
| NOVARTIS PHARMACEUTICALS CORPORATION, | |
| *Plaintiff*, | |
| v. | Case No. 25-CV-0117 (DLF) |
| ROBERT F. KENNEDY JR., *et al.*, | |
| *Defendants*. | |

## PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF SUMMARY JUDGMENT

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................................... ii

INTRODUCTION .................................................................................................................... 1

ARGUMENT .......................................................................................................................... 3

I.    SECTION 340B'S TEXT FORECLOSES THE GOVERNMENT'S
"PREAPPROVAL" INTERPRETATION........................................................................ 3

II.   HRSA'S REFUSAL TO APPROVE PLAINTIFFS' MODELS IS
ARBITRARY AND CAPRICIOUS ................................................................................ 9

    A.   HRSA Irrationally Distinguished Between Plaintiffs' Models And
The ADAP Cash-Rebate Model.................................................................... 9

    B.   HRSA Irrationally Distinguished Between Plaintiffs' Models And
The Product-Replenishment Model ........................................................... 12

    C.   HRSA's Policy Impedes Statutory Objectives........................................... 15

    D.   The Agency's Policy Precludes Manufacturers From Implementing
MFP-340B Nonduplication .......................................................................... 18

    E.   HRSA Has No Solution For The Program-Integrity Problems Of The
Current System And No Answer For The Benefits Of
Plaintiffs' Models....................................................................................... 22

III.   HRSA'S REFUSAL TO APPROVE BMS AND NOVARTIS'S
MODELS DENIES THEM DUE PROCESS OF LAW ............................................. 23

    A.   The Government's Position Deprives Plaintiffs Of Property Interests
In Their Medicines ...................................................................................... 24

    B.   HHS's Position Is Irrational And Gravely Unfair.................................... 28

    C.   Novartis Has No Meaningful Opportunity To Be Heard Regarding
Improper 340B Pricing............................................................................... 31

CONCLUSION .................................................................................................................... 33

# TABLE OF AUTHORITIES

Page(s)

CASES:

*Astra USA, Inc. v. Santa Clara County,*
    563 U.S. 110 (2011) ......................................................................................... 5, 6

*Banner Health v. Price,*
    867 F.3d 1323 (D.C. Cir. 2017) ............................................................................. 10

*Bennett v. Spear,*
    520 U.S. 154 (1997) ............................................................................................. 20

*Catholic Healthcare W. v. Sebelius,*
    748 F.3d 351 (D.C. Cir. 2014) ............................................................................. 11

*Center for Auto Safety v. National Highway Traffic Safety Admin.,*
    452 F.3d 798 (D.C. Cir. 2006) ............................................................................. 20

*Chiayu Chang v. USCIS,*
    254 F. Supp. 3d 160 (D.D.C. 2017) ..................................................................... 24

*Ciba-Geigy Corp. v. EPA,*
    801 F.2d 430 (D.C. Cir. 1986) ............................................................................. 20

*City of New York v. FCC,*
    814 F.2d 720 (D.C. Cir. 1987), *aff'd,* 486 U.S. 57 (1988) ................................. 19

*Cleveland Bd. of Educ. v. Loudermill,*
    470 U.S. 532 (1985) ............................................................................................. 31

*Committee of U.S. Citizens Living in Nicar. v. Reagan,*
    859 F.2d 929 (D.C. Cir. 1988), *abrogation on other grounds recognized,*
    *Schieber v. United States,* 77 F.4th 806 (D.C. Cir. 2023) ................................. 28

*County of Los Angeles v. Shalala,*
    192 F.3d 1005 (D.C. Cir. 1999) ........................................................................... 10

*CSI Aviation Servs., Inc. v. Department of Transp.,*
    637 F.3d 408 (D.C. Cir. 2011) ............................................................................. 22

*Da'Vage v. D.C. Hous. Auth.,*
    583 F. Supp. 3d 226 (D.D.C. 2022) ..................................................................... 32

*Doe v. Devine,*
    703 F.2d 1319 (D.C. Cir. 1983) ............................................................................. 5

*Eagle Pharms., Inc. v. Azar,*
    952 F.3d 323 (D.C. Cir. 2020) ............................................................................... 8

*Authorities upon which we chiefly rely are marked with an asterisk.

# TABLE OF AUTHORITIES–CONTINUED

Page(s)

*Encino Motorcars, LLC v. Navarro*,
  579 U.S. 211 (2016) ........................................................................6

*Esparraguera v. Department of the Army*,
  101 F.4th 28 (D.C. Cir. 2024)........................................................33

*\*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ...................................................................6, 14

*Financial Planning Ass'n v. SEC*,
  482 F.3d 481 (D.C. Cir. 2007).........................................................8

*Furlong v. Shalala*,
  156 F.3d 384 (2d Cir. 1998) ..........................................................25

*Horne v. USDA*,
  576 U.S. 350 (2015) .......................................................................25

*\*Independent Petroleum Ass'n of Am. v. Babbitt*,
  92 F.3d 1248 (D.C. Cir. 1996)........................................................13

*Independent U.S. Tanker Owners Comm. v. Dole*,
  809 F.2d 847 (D.C. Cir. 1987).......................................................15

*iTech U.S., Inc. v. Renaud*,
  5 F.4th 59 (D.C. Cir. 2021)..............................................................4

*Loving v. IRS*,
  742 F.3d 1013 (D.C. Cir. 2014)...................................................7, 8

*Mexichem Fluor, Inc. v. EPA*,
  866 F.3d 451 (D.C. Cir. 2017).........................................................7

*\*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins., Co.*,
  463 U.S. 29 (1983) .........................................................................15

*National Ass'n of Home Builders v. EPA*,
  682 F.3d 1032 (D.C. Cir. 2012)......................................................14

*National Park Hospitality Ass'n v. Department of Interior*,
  538 U.S. 803 (2003) .......................................................................21

*New England Power Generators Ass'n, Inc. v. FERC*,
  881 F.3d 202 (D.C. Cir. 2018).......................................................23

*Novartis Pharm. Corp. v. Johnson*,
  102 F.4th 452 (D.C. Cir. 2024)......................................................30

# TABLE OF AUTHORITIES–Continued

Page(s)

*Overseas Media Corp. v. McNamara*,
    385 F.2d 308 (D.C. Cir. 1967)....................................................................10

*Palestine Info. Off. v. Shultz*,
    853 F.2d 932 (D.C. Cir. 1988)....................................................................25

*Pharmaceutical Rsch. & Mfrs. of Am. v. HHS*,
    138 F. Supp. 3d 31 (D.D.C. 2015)........................................................20, 21

\*Propert v. District of Columbia*,
    948 F.2d 1327 (D.C. Cir. 1991)..................................................................32

*Rock River Health Care, LLC v. Eagleson*,
    14 F.4th 768 (7th Cir. 2021)......................................................................25

*Russello v. United States*,
    464 U.S. 16 (1983)........................................................................................4

*Sanofi Aventis U.S. LLC v. HHS*,
    58 F.4th 696 (3d Cir. 2023)........................................................................27

*Silverman v. Barry*,
    845 F.2d 1072 (D.C. Cir. 1988)..................................................................31

*Simms v. District of Columbia*,
    872 F. Supp. 2d 90 (D.D.C. 2012).............................................................33

*Thompson v. District of Columbia*,
    832 F.3d 339 (D.C. Cir. 2016)....................................................................32

*Trans-Pacific Freight Conf. of Japan/Korea v. Fed. Mar. Comm'n*,
    650 F.2d 1235 (D.C. Cir. 1980)....................................................................5

*United States v. Bronstein*,
    849 F.3d 1101 (D.C. Cir. 2017)....................................................................5

*Westar Energy, Inc. v. FERC*,
    473 F.3d 1239 (D.C. Cir. 2007)..................................................................13

*Window Covering Mfrs. Ass'n v. Consumer Prod. Safety Comm'n*,
    82 F.4th 1273 (D.C. Cir. 2023)..................................................................23

*Wood v. Ostrander*,
    879 F.2d 583 (9th Cir. 1989)......................................................................26

\*Valancourt Books, LLC v. Garland*,
    82 F.4th 1222 (D.C. Cir. 2023)..............................................................27, 28

# TABLE OF AUTHORITIES–Continued

Page(s)

*Vietnam Veterans of Am. v. Shinseki*,
    599 F.3d 654 (D.C. Cir. 2010) ..................................................................... 24

**Regulations:**

59 Fed. Reg. 25,110 (May 13, 1994) .................................................................. 7

61 Fed. Reg. 65,406 (Dec. 12, 1996) ........................................................... 16, 32

*63 Fed. Reg. 35,239 (June 29, 1998) ..................................................... 10, 11, 33

84 Fed. Reg. 38,639 (Aug. 7, 2019) ................................................................. 16

89 Fed. Reg. 28,643 (Apr. 19, 2024) ................................................................ 17

**Statutes:**

21 U.S.C. § 355a ............................................................................................... 25

21 U.S.C. § 355(c)(3)(E)(ii) ............................................................................. 25

21 U.S.C. § 355(c)(3)(E)(iii)–(iv) .................................................................... 25

21 U.S.C. § 355(j)(5)(F)(ii) .............................................................................. 25

21 U.S.C. § 355(j)(5)(F)(iii)–(iv) ..................................................................... 25

21 U.S.C. § 360cc ............................................................................................ 25

*42 U.S.C. § 256b(a)(1) .......................................... 1, 4, 5, 7, 18, 23, 25, 26

42 U.S.C. § 256b(a)(2) ....................................................................................... 4

42 U.S.C. § 256b(a)(4)–(5) .............................................................................. 26

42 U.S.C. § 256b(a)(5)(A) .................................................................................. 4

42 U.S.C. § 256b(d)(1)(B)(iv) ........................................................................... 4

42 U.S.C. § 256b(d)(1)(B)(i)(II) ...................................................................... 16

42 U.S.C. § 256b(d)(1)(B)(vi) .......................................................................... 20

42 U.S.C. § 256b(d)(2)(A) ............................................................................... 23

42 U.S.C. § 256b(d)(3)(A) ............................................................................... 16

42 U.S.C. § 1320f(a) ................................................................................... 18, 23

42 U.S.C. § 1320f(a)(2) ............................................................................... 21, 23

42 U.S.C. § 1320f-2(a)(1) ................................................................................ 26

# TABLE OF AUTHORITIES–CONTINUED

Page(s)

42 U.S.C. § 1320f-2(d) ....................................................................21, 23, 26

42 U.S.C. § 1396r-8(a)(1) ..........................................................................27

42 U.S.C. § 1396r-8(5)(A) .........................................................................27

**OTHER AUTHORITIES:**

CMS, *Medicare Drug Price Negotiation Program: Final Guidance, Implementation of Section 1191-1198 of the Social Security Act for Initial Price Applicability Year 2027 and Manufacturer Effectuation of the Maximum Fair Price in 2026 and 2027* (Oct. 2, 2024) ....................................................18, 19, 21, 28, 29

CMS, *Medicare Drug Price Negotiation Program: Negotiated Prices for Initial Price Applicability Year 2026* (Aug. 2024) ................................20, 25

CMS, *October 2024 Medicaid & CHIP Enrollment Data Highlights* (last updated Jan. 15, 2024) ..............................................................................................27

GAO, *HHS Uses Multiple Mechanisms to Help Ensure Compliance with 340B Requirements*, GAO-21-107 (Dec. 2020)....................................................17, 26

HHS, Office of the Assistant Secretary for Planning & Evaluation, *Medicare Part B Drugs: Trends in Spending & Utilization, 2008–2021* ..................................27

House Energy & Commerce Comm., *Review of the 340B Drug Pricing Program* (Jan. 10, 2018) ............................................................................................17, 26

HRSA, *340B Drug Pricing Program* (last updated Jan. 2025), https://www.hrsa.gov/opa....................................................................................20

HRSA, Off. of Pharmacy Affairs, *Recertification* (last accessed Mar. 31, 2025)........................16

Kalderos, *2022 Annual Report: Conquering the "Great Unknown,"* (2022) ..............................17

Cathy Kelly, *CMS May Engage in Medicare, 340B Discount Deduplication 'Eventually,' Ex-CMS Official Says*, Citeline Regulatory (Mar. 13, 2025) ....................29

Ashwin Mundra, Drug Channels, *The 340B Noncompliance Data Gap Leaves Drug Manufacturers in the Dark* (Mar. 18, 2022) ....................................17, 26

Michael Schlander et al., *How Much Does It Cost to Research and Develop a New Drug? A Systematic Review and Assessment*, 39 PharmacoEconomics 1243 (Aug. 9, 2021)........................................................................................25

**INTRODUCTION**

This case presents a straightforward statutory-interpretation question about the methods Plaintiffs may use to effectuate the 340B price.  The 340B statute requires the Secretary of Health and Human Services (HHS) to "enter into an agreement" with manufacturers—a Pharmaceutical Pricing Agreement (PPA)—that requires manufacturers to drastically lower the prices of their medicines for certain healthcare providers called covered entities.  42 U.S.C. § 256b(a)(1).  The statute identifies two possible methods for making these reduced prices available: an up-front "discount" or a back-end "rebate."  *Id.*  When Secretary enters PPAs with manufacturers, the statute allows him to "provide[ ]" for a pricing methodology.  *Id.*  He has not purported to do so.  Plaintiffs' PPAs neither mandate the use of the prevailing product-replenishment model nor prohibit cash rebates—in fact, they contain *no* instructions for effectuating 340B pricing.  The Government does not contend otherwise, and that should end the analysis.

Plaintiffs' interpretation ensures every word in the 340B statute retains meaning.  And Plaintiffs' statutorily authorized cash-rebate or cash-replenishment models address the rights and obligations of *both* manufacturers and covered entities, and are consistent with program precedents and standard business practices.  Critically, they also provide a mechanism for addressing both the longstanding program integrity concerns that virtually every relevant government watchdog has found to be commonplace and new statutory provisions for which the government has made no allowances.  The status quo, so strongly defended by the Government, can claim no similar benefits.

HHS's Secretary, acting through the Health Resources and Services Administration (HRSA), claims his ability to "provide[ ]" for either "discounts" or "rebates" in manufacturers' PPAs means manufacturers must get preapproval to implement their models.  But the Secretary has

never before claimed to have, much less exercise, the *ad hoc* preapproval power—backed by business-destroying sanctions—he asserts in this case. The novelty of this position is powerful evidence that it is incorrect, and the statute's text, structure, and even drafting history likewise point in one direction: Whatever limitations the Secretary may be able to impose on the use of rebates or discounts to accomplish 340B pricing must be contained in PPAs, not sprung on manufacturers in whatever form and on whatever timeline the Secretary deems convenient.

Even apart from the statutory text, the Government has failed to make sense of HRSA's refusal to approve Plaintiffs' models. The Government's sole answer to the cash-rebate model's decades-long use by AIDS Drug Assistance Programs (ADAPs), a type of covered entity, is that they are somehow unique. But the Government has not explained how the ADAPs' particular attributes *today* are relevant to the question of whether a rebate model for other covered-entity types is permissible, and it is telling that the Government has not identified any instance in which the ADAP rebate model has led to the parade of horribles it frets about, much less HRSA doing so in the administrative record. And the Government does not dispute the extant product-replenishment model relies on post-purchase true-ups to effectuate the 340B price, making it a rebate model—just like Plaintiffs' proposed models. These structural similarities leave no room for singling out Plaintiffs' models for harsher scrutiny.

Worse, the Government admits to making distinctions with no legitimate regulatory basis. It acknowledges its view that up-front discounts are its "preferred" way of implementing 340B pricing, even though the statute treats rebates and discounts as peers, and even though *no* widely used 340B pricing method is an up-front discount. And the Government even admits to privileging covered entities' preferences over program integrity, which it attempts to justify because manufacturers sign PPAs and covered entities do not. Of course, HRSA directly regulates covered entities, too, but even that is beside the point: Absent Congressional authorization, agencies do not get to

pick winners and losers.  Congress tells agencies what factors they may consider when making decisions.  Covered entities get no special preferences beyond that.

Perhaps worst of all, the Government has no answer for the Inflation Reduction Act (IRA)-related harms HRSA's policy will soon unleash.  At most, it tries to deflect blame among Health and Human Services (HHS) subcomponents and suggests things might get better at some unspecified future time.  That wishful thinking has not worked for the 340B Program to date and it will not work for the IRA's "maximum fair price" (MFP) process either.  Congress gave HHS's Secretary oversight responsibility over both the 340B and IRA programs.  And HHS's time to figure out a solution for implementing Congress's no-MFP-340B duplication mandate has long passed.  In just over five months, BMS and Novartis must submit plans for effectuating the MFPs HHS imposed on them, and given the complexity of that task, BMS and Novartis need time to road-test the way they will comply.  And the Government's proposed solution for the double-dipping dilemma the companies face—a back-end credit and debit process—is no solution at all because manufacturers must have proof that a full MFP rebate has been given on an already 340B-priced unit, proof that companies rarely have under the product-replenishment model.  The Government's "solution," in other words, is to tell manufacturers to accept unlawful duplication even though their models would solve the problem.

For all these reasons, HRSA's refusal to approve Plaintiffs' rebate models and its general policy forbidding rebate models absent HRSA preapproval should be vacated and set aside.

## ARGUMENT

### I.    SECTION 340B'S TEXT FORECLOSES THE GOVERNMENT'S "PREAPPROVAL" INTERPRETATION.

As Plaintiffs have explained, the 340B statute does not discriminate or express a preference between rebates and discounts.  Lilly Opening Br. 26–27; BMS Opening Br. 24; Novartis Opening

Br. 20. The statute merely provides that manufacturers enter into an agreement where "the amount required to be paid" accounts for "any rebate or discount, as provided by the Secretary." 42 U.S.C. § 256b(a)(1). Post-purchase rebates and point-of-sale discounts are both authorized, so long as the price is at or below the 340B ceiling price. Novartis Opening Br. 20; *see also* Lilly Opening Br. 27; BMS Opening Br. 24–25.

That statutory indifference to discounts and rebates continues throughout section 340B's text. The very next paragraph, for example, defines the statutory ceiling price, which is achieved by reducing the "average manufacturer price." *See* 42 U.S.C. § 256b(a)(2). That reduction is called the "rebate percentage." *Id.* Later, in the statute's duplication prohibition, it again describes "discounts or rebates." *Id.* § 256b(a)(5)(A). And when Congress amended the 340B statute to try to improve its functionality, one of the targeted changes was a "mechanism" for reporting "rebates and other discounts" and ensuring that "such discounts or rebates" resulted in the appropriate ceiling price. *Id.* § 256b(d)(1)(B)(iv). That persistent textual parity between rebates and discounts belies any suggestion that the statute disfavors rebates—much less prefers product replenishment. "Had Congress intended to" mandate the use of point-of-sale discounts, "it presumably would have done so expressly." *Russello v. United States*, 464 U.S. 16, 23 (1983).

**1.** The Government does not disagree. *See* Gov. Br. 10 ("To be sure, Congress did not mandate that the manufacturers effectuate the price reductions though upfront discounts . . . ."); Gov. Br. 14 ("The statute does not prohibit rebate models in the abstract . . . ."). The Government nonetheless insists that the words "as provided by the Secretary" mean that manufacturers cannot implement rebate models without HRSA's advance blessing. Gov. Br. 10–11.

But courts "do not read snippets of statutory text in a vacuum." *iTech U.S., Inc. v. Renaud*, 5 F.4th 59, 63 (D.C. Cir. 2021). Section 340B directs the Secretary to "enter into an agreement with each manufacturer"—that is, a PPA—"*under which* the amount required to be paid" to the

manufacturer does not exceed the ceiling price. 42 U.S.C. § 256b(a)(1) (emphasis added). The Secretary's ability to "provide" for the use of any particular pricing method must be exercised, if at all, "under" the Secretary's "agreement[s] with each manufacturer." *Id.* Put differently, any restrictions on the selection of either rebates or discount must be contained in the PPA, which binds its signatories. *See Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110, 118 (2011).

Section 340B's broader context confirms as much; the phrase "as provided by the Secretary" occurs in the subsection devoted solely to establishing "requirements for agreement with Secretary." 42 U.S.C. § 256b(a) (capitalization altered). The subsection's "scope is apparent from its title," *United States v. Bronstein*, 849 F.3d 1101, 1109 (D.C. Cir. 2017)—it covers only the content of "agreements," rather than giving HRSA unfettered discretion to employ case-by-case decisionmaking. And "[j]ust as Congress' choice of words is presumed to be deliberate, so too are its structural choices." *University of Tx. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 354 (2013).

Congress's structural choice answers the Government's charge that Plaintiffs' reading of "as provided by the Secretary" renders that phrase surplusage. Gov. Br. 11. Plaintiffs do not deny that the Secretary *can* "provide[ ]" for a rebate or discount model. *See* Lilly Opening Br. 25; BMS Opening Br. 26–27; Novartis Opening Br. 21–22. But section 340B directs that the Secretary do that providing in a certain way: by amending the PPA. For good reason. The choice between discount and rebate is sufficiently important that the Government should not impose one or the other without articulating a reasoned basis for doing so, through the public and transparent process that accompanies PPA amendment. *See Doe v. Devine*, 703 F.2d 1319, 1326 (D.C. Cir. 1983) (applying the arbitrary-and-capricious standard to an agency's contracting behavior); *Trans–Pacific Freight Conf. of Japan/Korea v. Federal Mar. Comm'n*, 650 F.2d 1235, 1244–45 (D.C. Cir. 1980) ("Rulemaking is an essential component of the administrative process and indeed is often the preferred procedure for the evolution of agency policies."). And were HRSA to engage in that

public process, it would be hard-pressed to articulate any reasonable basis for enshrining the disas-trous product-replenishment model as a legal requirement. *See* Lilly Opening Br. 14–17; BMS Opening Br. 12–15; Novartis Opening Br. 11–14 (detailing the rampant program-integrity issues with the product-replenishment system). Any attempt to do so would entangle the agency in a doomed attempt to "show that there are good reasons" for eschewing a transparent, fair solution to those problems. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)).

The Government contends that HRSA *could not* amend manufacturers' PPAs to provide for a rebate or discount model because *Astra* explained that PPAs are "uniform agreements that recite the responsibilities § 340B imposes, respectively, on drug manufacturers and the Secretary." 563 U.S. at 113. This argument—to which the Government returns no fewer than three times (at 10, 11–12, 17–18)—misreads *Astra*. The question in *Astra* was whether covered entities could bring private suits to enforce the 340B statute as supposed third-party beneficiaries of the PPAs. *Id.* at 113–114. The Supreme Court held that the answer was "no"; covered entities had no private right of action to enforce the 340B statute, and the PPAs, which "simply incorporate statutory ob-ligations and record the manufacturers' agreement to abide by them," could not change that because "[t]he statutory and contractual obligations . . . are one and the same." *Id.* at 117–118. Exactly. Amending the PPA here to provide for a rebate or discount model would "incorporate [the] statutory obligation[ ]" to provide for a discount or rebate. *Id.* at 118.

The Government's theory drastically overreads *Astra*'s holding by suggesting that PPAs may *say* only what is in the statute—and cannot therefore impose any new requirements. That view clashes with the text of manufacturers' PPAs, which impose multiple extra-statutory duties. One example: Manufacturers must "retain all records that may be necessary" for certain reporting re-quirements. AR 39–40. Another example: Manufacturers must "hold audit information obtained

from the covered entities confidential."  AR 42.  HRSA imposed these requirements by providing for them in the PPA—just as the statute directs the agency to do if it wishes to restrict the use of "any rebate or discount."  42 U.S.C. § 256b(a)(1).

**2.**  HRSA's past approach to overseeing pricing models confirms that its "novel reading" of section 340B is "inconsistent with the statute as written."  *Mexichem Fluor, Inc. v. EPA*, 866 F.3d 451, 454 (D.C. Cir. 2017); *see also Loving v. IRS*, 742 F.3d 1013, 1021 (D.C. Cir. 2014).  Although the Government contends (at 10) that "Congress . . . did not contemplate a regime where a manufacturer would choose whether to offer discounts or rebates without approval of the Secretary," that is *precisely* what happened for the past 30-plus years.  HRSA has never preapproved the ADAP-rebate or product-replenishment models.  *See* Lilly Opening Br. 31, 34–35; BMS Opening Br. 8, 19; Novartis Opening Br. 26, 29.  The Government admits as much (at 15) for the ADAP model, and it rightly does not contest that the product-replenishment model was never pre-approved.[1]  Yet manufacturers and covered entities have used these models for decades without facing the cease-and-desist letters warning of civil monetary penalties and PPA terminations that HRSA volleyed here.

Under the Government's reading, however, manufacturers were violating the 340B statute until HRSA recognized the ADAP rebate model through notice and comment, and manufacturers are again violating the 340B statute today in acquiescing to covered entities' use of the product-

[1]  The state and regional hospital associations point out that, early in the 340B Program, HRSA commented that covered entities need not get "preclearance" before using anti-diversion "safeguard[s]" that the associations characterize as part of the product-replenishment model.  No. 24-CV-3220, ECF No. 39-1 at 7 (quoting Final Notice Regarding Section 602 of the Veterans Health Care Act of 1992 Entity Guidelines, 59 Fed. Reg. 25,110, 25,111 (May 13, 1994)).  This point reinforces the novelty of HRSA's argument that methods of effectuating 340B prices require its preapproval.  The associations do not even try to explain why this permissiveness should apply to the product-replenishment model alone.

replenishment model—all without drawing an enforcement response from HRSA. That seems unlikely in the extreme; agencies need not pursue every statutory violation by regulated parties, but "in the circumstances of this case, . . . it [is] rather telling that [HRSA] ha[s] never before maintained that it possessed this [preapproval] authority." *Loving*, 742 F.3d at 1021; *see also Financial Planning Ass'n v. SEC*, 482 F.3d 481, 490 (D.C. Cir. 2007) (rejecting agency interpretation that "flouts six decades of consistent [agency] understanding of its authority under" the statute). The best reading of the statute is the one that HRSA has adhered to until this case: Manufacturers may use a rebate or discount model to effectuate the 340B ceiling price unless the Secretary provides otherwise in manufacturers' PPAs.

**3.** Finally, the Government seeks refuge in section 340B's legislative history. Gov. Br. 12. The Court need not "resort to legislative history" to interpret "statutory text that is clear." *Eagle Pharms., Inc. v. Azar*, 952 F.3d 323, 339 (D.C. Cir. 2020) (citation omitted). But the relevance, if any, of the legislative history here reaffirms the statute's plain language. The key House Committee on Energy and Commerce report on the 340B bill recognized that "manufacturers, as a condition of receiving Federal Medicaid matching funds on their covered outpatient drugs, would have to *enter into an agreement* with the Secretary of HHS to provide price reductions (*whether through a discount, rebate, or other mechanism*) to these 'covered entities' on covered outpatient drugs." H.R. Rep. No. 102-384(II), *12 (1992) (emphases added). In addition to confirming that a rebate model is an available mechanism for offering 340B pricing to covered entities, that passage signals the Secretary would need to exercise any power to direct a pricing model only through the PPA. *See id.* The legislative history undermines, rather than supports, the Government's view.

## II.    HRSA'S REFUSAL TO APPROVE PLAINTIFFS' MODELS IS ARBITRARY AND CAPRICIOUS.

HRSA's refusal to approve Plaintiffs' rebate models is doubly unlawful because it is also arbitrary and capricious. *See* Lilly Opening Br. 30–44; BMS Opening Br. 27–42; Novartis Opening Br. 23–34. *First*, HRSA has already asked and answered the rebate-model question with ADAPs. HRSA blessed the rebate model for ADAPs, and the agency may not now block the model's implementation here without irrationally treating like cases differently. *Second*, the product-replenishment model and the rebate model are legally equivalent, meaning HRSA may not elevate one over the other. *Third*, HRSA's actions force Plaintiffs to provide 340B pricing where none is owed, a result that perpetuates unlawful diversion and duplicate discounting. *Fourth*, HRSA's position denies BMS and Novartis the only feasible means of preventing MFP-340B duplication. *Finally*, the agency's decision fails to consider an important aspect of the problem—namely, the compelling operational and program-integrity reasons for adopting the rebate model—and HRSA's position undermines the commonsense benefits the rebate model offers. Each of those defects is an independent reason to grant summary judgment for Plaintiffs.

### A.    HRSA Irrationally Distinguished Between Plaintiffs' Models And The ADAP Cash-Rebate Model.

There is no reasoned basis—especially not a reasoned basis in the record—on which HRSA could treat Plaintiffs' models differently from the model manufacturers use for ADAPs. HRSA did not object to a rebate model in the ADAP context, on-point agency precedent that HRSA now calls an "exception," Gov. Br. 3, and that makes its reaction against Plaintiffs' rebate models all the more unreasonable. AR 57–58, 332–333, 436–437. The Government offers thin defenses for its uneven approach to rebate models, none of which withstand scrutiny.

For one, HRSA never preapproved the ADAP rebate model or asserted the model was subject to a preapproval requirement. A notice-and-comment process unfolded *after* ADAPs began

using a rebate model, and HRSA "recognized" that model eventually—but that is far different from preapproval. 63 Fed. Reg. 35,239, 35,240 (June 29, 1998). If anything, the agency's suggestion that approval of a 340B Program rebate model is gated behind a notice-and-comment process that HRSA *could* (but is not mandated to) follow only underscores the arbitrariness of its disapproving Plaintiffs' models. *See Overseas Media Corp. v. McNamara*, 385 F.2d 308, 313–314 (D.C. Cir. 1967). For the agency to insist it "has the authority to determine the mechanism" for 340B pricing with respect to Plaintiffs' models is arbitrary because it treats like cases differently without a valid justification for doing so. Gov. Br. 14; *see Banner Health v. Price*, 867 F.3d 1323, 1349 (D.C. Cir. 2017) ("HHS's approach was internally inconsistent and inadequately explained. HHS's broad discretion in this area is not a license to treat like cases differently.") (internal quotation marks, citations, and ellipses omitted).

What's more, the method of payment for Plaintiffs' models and the ADAP cash-rebate model are identical. With the ADAP cash-rebate model, HRSA said that an after-purchase rebate "as a method" of furnishing "the 340B discount provided by the statutory ceiling price" was legitimate. 63 Fed. Reg. at 35,242. HRSA offers no adequate response to justify its differential treatment of Plaintiffs' models; covered entities' interests may "vary," but the means by which they access 340B pricing cannot be subject to the agency's whim. Gov. Br. 15. For this reason as well, the agency's action is arbitrary. *See County of Los Angeles v. Shalala*, 192 F.3d 1005, 1023 (D.C. Cir. 1999).

As for concerns about covered entities' cash flow, HRSA suggested that ADAPs and manufacturers may use "standard business practices" to assist in advance planning for any issues that may arise. 63 Fed. Reg. at 35,239–42. That logic applies equally to other covered entities. Here again, the Government provides no explanation why ADAPs, but not major disproportionate share

hospitals (DSH)—some of the largest, most sophisticated, and most profitable hospitals in the country—can accommodate short windows between wholesale purchases and rebates. Gov. Br. 15. The record shows that Plaintiffs' models would preserve covered entities' cash flow as well as, if not better than, the product-replenishment model does. AR 269, 287. And the Government does not dispute that ADAPs' reliance on a network of retail pharmacies closely resembles the contract-pharmacy and third-party-administrator arrangements that hospitals and other covered entities use under the product-replenishment model. *See* BMS Opening Br. 31; Novartis Opening Br. 28; Lilly Opening Br. 36. Even the Government's abbreviated discussion of ADAPs in its briefing is entirely new: Nowhere in the administrative record did HRSA try to draw these supposed distinctions. *Catholic Healthcare W. v. Sebelius*, 748 F.3d 351, 354 (D.C. Cir. 2014) (an agency's decision cannot be sustained "on a legal analysis other than that expressed by the agency").

HRSA's comparative reasoning with respect to ADAPs is also wrong. To be sure, a rebate model for ADAPs was especially appropriate because ADAPs had difficulty accessing 340B-priced medicines through other means. Gov. Br. 15 (citing 63 Fed. Reg. at 35,240). But HRSA clings to the premise that discounts are the default mechanism, unless it finds good reasons to deviate.[2] Nowhere does the statute prioritize one or the other or authorize HRSA to reserve a rebate model for some types of covered entities and not others, however. And the fact that ADAPs face "unique" challenges that may prevent them from using a discount model, Gov. Br. 16 (citation omitted), hardly suggests that other 340B covered entities are uniquely well-suited to a discount model *only*. HRSA's guidance document also does not support that reading, which HRSA notably did not rely

---

[2] This premise also clashes with the omnipresence of the product-replenishment model, which is fundamentally a rebate model, not a discount model. Lilly Opening Br. 32–33; BMS Opening Br. 33–34; Novartis Opening Br. 29–30.

on to reach its decision. AR 342–344 (BMS Ltr.); AR 292–294 (Lilly Ltr.); AR 202–204 (Johnson & Johnson Ltr.); AR 380–382 (Sanofi Ltr.); AR 439–441 (Novartis Ltr.).

### B. HRSA Irrationally Distinguished Between Plaintiffs' Models And The Product-Replenishment Model.

HRSA's refusal to approve Plaintiffs' rebate models is also arbitrary and capricious because the existing product-replenishment model is itself a rebate model. Lilly Opening Br. 32–33; BMS Opening Br. 33–34; Novartis Opening Br. 29–30. The Government disagrees. Gov. Br. 16–17. But the Government makes a critical—indeed, dispositive—concession: The product-replenishment model begins with a wholesale-price purchase, followed by a later purchase at the 340B price. Gov. Br. 17 ("[U]nder the product replenishment model, the covered entity only pays the wholesale price for its initial purchase."). Both models therefore rely on retrospective provisioning of the 340B price, after an initial purchase of medicine at the market price. AR 203 (HRSA acknowledging that "under a typical replenishment structure, a covered entity generally makes an initial purchase at a higher price").

That is a rebate model: Plaintiffs' model of a rebate paid in cash can be described in the exact same way as the existing product-replenishment model. Suppose a manufacturer wholesales medicine for $100 a unit and the 340B ceiling price on the unit is $50. Under Plaintiffs' models, a covered entity purchases its first unit for $100, uses the unit to fill its eligible patients' prescriptions, and receives a $50 cash rebate. The covered entity can put that $50 rebate towards the purchase of a replacement unit of medicine, such that it pays only $50 out of pocket for the replacement unit. The covered entity then uses the replacement unit to fill its eligible patients' prescriptions, receives another $50 rebate, can apply the $50 towards another $100 replacement purchase of medicine, and so on in perpetuity. There is an initial wholesale-price purchase that begins a flywheel of later

reduced-price purchases under both models, and the covered entity must pay the full wholesale price for only the first purchase.

With the Government's misconceptions cleared up, the arbitrariness of HRSA's denial becomes plain: "A fundamental norm of administrative procedure requires an agency to treat like cases alike." *Westar Energy, Inc. v. FERC*, 473 F.3d 1239, 1241 (D.C. Cir. 2007). Thus, "[i]f the agency makes an exception in one case, then it must either make an exception in a similar case or point to a relevant distinction between the two cases." *Id.* Applied here, if HRSA has tacitly blessed the product-replenishment model, with no preapproval requirement, then it should do the same for Plaintiffs' functionally identical rebate models. The only difference between the two is that instead of replacing product with product, as the product-replenishment model does, Plaintiffs' models replace product with cash that can be used to replace the product; that is precisely why Lilly's model is called a "cash-replenishment" model. *See* Lilly Opening Br. 18 n.12.

*Independent Petroleum Association of America v. Babbitt*, 92 F.3d 1248 (D.C. Cir. 1996), is instructive. There, the Department of Interior sought to collect royalties on one type of payment made to gas producers, but not another. *Id.* at 1260. Although the payment types differed in that only one "follow[ed] negotiations between the parties over the cancellation of contractual obligations," the Court concluded that this distinction made no difference when assessing "the functional nature of the payments for royalty purposes." *Id.* Here too, the functional nature of the product-replenishment model and Plaintiffs' intended rebate models is the same: Both depend on an initial purchase at wholesale rates followed by subsequent purchases at reduced prices. Against that backdrop, HRSA has failed to articulate a sufficient, nonarbitrary rationale for treating the two models differently. *See id.* at 1260 ("The treatment of cases A and B, where the two cases are functionally indistinguishable, must be consistent. That is the very meaning of the arbitrary and capricious standard.").

The Government also doubles down on its *ad hoc* preapproval authority argument, pointing out (at 14) that in rebuffing Plaintiffs' intended rebate models, "the Agency never said never," even though it has clearly and repeatedly said "no."[3]  The problem, of course, is that the agency never said anything, at all, that might be characterized as preapproving the product-replenishment model. HRSA's insistence on arrogating to itself that power now is not just contrary to the statute—it runs counter to the agency's past practice.

The heavy implication from HRSA's interrogating questions to manufacturers is that the agency is looking for problems with Plaintiffs' models while ignoring the models' proven benefits. *See* AR 66–68 (J&J); AR 292–294 (Lilly); AR 380–382 (Sanofi); AR 342–444 (BMS); AR 439–441 (Novartis).  Take the first "question" HRSA posed to manufacturers:  "Shifting to a rebate model would disrupt how the 340B Program has operated for over thirty years."  *E.g.*, AR 342 (BMS); AR 439 (Novartis).  That HRSA has failed to even acknowledge its changing tune renders the agency's position arbitrary and capricious.  And that implication is confirmed by HRSA asking covered-entity advocates at a meeting to "gather some more specific information from our members about how changes to 340B policies would affect our members."  AR 586.  HRSA must 'provide reasoned explanation for its' " approach, "which 'would ordinarily demand that it display awareness that it *is* changing position.' " *National Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1038 (D.C. Cir. 2012) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). HRSA has not.

---

[3]  Recall that the well-documented programmatic abuses date back decades, AR 591–592, and HRSA has been discussing a rebate model with Kalderos since February 2019 and manufacturers since July 2024.  AR 499, AR 52–54 (HRSA notes following meeting with J&J).  The agency has shown itself unwilling to fix the 340B Program's problems or reasonably engage with those trying to do so.

C.    **HRSA's Policy Impedes Statutory Objectives.**

The Government does not contest one of the chief flaws in HRSA's insistence on the product-replenishment model:  The 340B statute prohibits duplicate-discounting and diversion, yet the product-replenishment model inherently enables violations of those key statutory provisions. AR 300.  The product-replenishment model commingles 340B and non-340B inventory, and uses a pass-the-baton methodology for moving the 340B price and attendant compliance obligations from unit to unit.  AR 324.  That means that Plaintiffs' medicines are all-too-frequently diverted to non-340B-eligible patients—a problem exacerbated by prolific contract-pharmacy arrangements. And because HRSA currently lacks the oversight tools or the will to monitor for unlawful duplication, manufacturers also pay multiple price concessions on the same unit.  Novartis Opening Br. 24–25; BMS Opening Br. 34–36; Lilly Opening Br. 7.  As the agency tasked with enforcing the 340B statute and its anti-duplication, anti-diversion aims, HRSA was at minimum required to acknowledge this inconsonance.  Its failure to clear even that minimum bar was arbitrary and capricious.  *See Independent U.S. Tanker Owners Comm. v. Dole*, 809 F.2d 847, 854 (D.C. Cir. 1987) (agency's failure to discuss how rule squares with statute's objective is arbitrary and capricious).

HRSA emphasizes that the agency has not conducted "a searching inquiry" into the possible "disruption" occasioned by Plaintiffs' rebate models, saying only that discounts are "the preferred price reduction mechanism" because covered entities prefer them.  Gov. Br. 20–21; *see also id.* at 14 ("The Agency has long envisioned upfront discounts as the preferred price reduction mechanism, because covered entities generally preferred a discount system.") (internal quotation marks, brackets, and citation omitted).  The preference of covered entities is not a statutory factor that Congress instructed HRSA to consider.  *Motor Vehicles Mfrs. Ass'n v. State Farm Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider.").  Its action should be set

aside now, notwithstanding the agency's interest in preserving the status quo until it finds the time to meet its APA obligations.  Gov. Br. 13, 21.

The Government also suggests it can privilege the interests of covered entities because HRSA enters into regulatory agreements with manufacturers alone.  Gov. Br. 17–18.  But HRSA follows a certification and recertification process dictated by federal law for covered entities meant to police covered entities' compliance with 340B, just as HRSA regulates manufacturers' compliance through enforcing their PPAs.  *Compare* HRSA Off. of Pharmacy Affairs, *Recertification* (last accessed Mar. 31, 2025) ("The Office of Pharmacy Affairs (OPA) is required to recertify all participating 340B covered entities annually to ensure that they are eligible to remain in the [340B Program]," which "gives OPA an opportunity to verify compliance with the program requirements . . . ."), https://tinyurl.com/rtapk23n, *with* 42 U.S.C. §§ 256b(a)(7), 256b(d)(1)(B)(i)(II).  HRSA itself has equated its certification and recertification authority over covered entities with its PPA authority over manufacturers.  84 Fed. Reg. 38,639, 38,640 (Aug. 7, 2019).

All the Government's (at 20) emphasis on the ADR process as recourse ignores that a manufacturer may access the ADR process only after it has completed an audit, 42 U.S.C. § 256b(d)(3)(A), which is burdensome and time-intensive, and is all the more so due to extra-statutory obligations that HRSA imposes on manufacturers—obligations HRSA makes difficult for manufacturers to meet by denying them the ability to obtain the evidence necessary to meet the agency's extraneous requirements.  Critically, HRSA allows audits only after a manufacturer has compiled and submitted evidence that a violation of the 340B statute has occurred, HRSA has confirmed there is "reasonable cause" to conduct an audit, and manufacturers hire outside auditors to conduct the audits—which can take years.  Manufacturer Audit Guidelines and Dispute Resolution Process, 61 Fed. Reg. 65,406, 65,410 (Dec. 12, 1996).  Just last year, HRSA acknowledged that

these barriers mean manufacturers are rarely able to actually use the ADR process: "Since November 2022, HRSA has received two final audit reports from the manufacturers. The infrequency of finalized manufacturer audit reports along with the requirement that manufacturers audit covered entities prior to filing an ADR claim suggests that the number of manufacturer ADR claims will be low." ADR Final Rule, 89 Fed. Reg. 28,643, 28,644–45 (Apr. 19, 2024). Given the 340B Program's ubiquitous compliance failures, the obvious explanation for the paucity of finalized audits and ADR proceedings is that HRSA's burdensome procedures are denying manufacturers access.

Besides, HRSA overlooks audits' lackluster track record of enforcing program integrity. Lilly's experience attempting to audit covered entities confirms as much. Despite receiving HRSA's approval to implement two audit plans, covered entities have dragged their feet and refused to produce documents HRSA specifically authorized Lilly to seek, with "HRSA . . . refus[ing] to require compliance and enforce the very document requests that it previously approved." Brief of Eli Lilly & Co. as *Amicus Curiae*, *Sanofi-Aventis U.S. LLC v. HHS*, No. 24-CV-1603 (DLF) (D.D.C. Oct. 31, 2024), ECF No. 19-1 at 7-10, 13. But the best proof of these processes' current inadequacy is ultimately the real-world results: rampant duplication and other improper pricing,[4] costs to the Government from improperly claimed Medicaid discounts, and a system in which "stakeholders can feel they are operating in the dark." Kalderos, *2022 Annual Report: Conquering the "Great Unknown"* 24–25 (2022), https://tinyurl.com/45tv6bw6.

---

[4] *See, e.g.*, AR 432 n.19 (citing GAO, *HHS Uses Multiple Mechanisms to Help Ensure Compliance with 340B Requirements*, GAO-21-107 at 14 (Dec. 2020) (2020 GAO Report), https://www.gao.gov/assets/gao-21-107.pdf; House Energy & Commerce Comm., *Review of the 340B Drug Pricing Program* 36–37 (Jan. 10, 2018) (340B Review), https://tinyurl.com/58rpjkf; Ashwin Mundra, Drug Channels, *The 340B Noncompliance Data Gap Leaves Drug Manufacturers in the Dark* (Mar. 18, 2022), https://tinyurl.com/445uvh88); Lindsay Bealor Greenleaf, *Analysis of FY 2021 HRSA 340B Covered Entity Audits* (Feb. 23, 2023), https://tinyurl.com/yc2aktnh.

What's more, manufacturers who have availed themselves of their audits rights are fighting off legal challenges from covered entities that seek to stop them in their tracks.[5]  Far from a fix for Plaintiffs' well-founded complaints, the ADR and audit process—as HRSA administers it—ensures that manufacturers are unable to pursue 340B statutory compliance through one of the few means theoretically available.

### D.    The Agency's Policy Precludes Manufacturers From Implementing MFP-340B Nonduplication.

BMS and Novartis have set out how their obligations under the Drug Price Negotiation Program's maximum fair price provisions and the 340B statute are incompatible with the current product-replenishment model, as well as how the rebate model is the only readily available means manufacturers have to solve the problem.  BMS Opening Br. 38–40, Novartis Opening Br. 34–36.  Because the Drug Price Negotiation Program lacks any plausible mechanism for avoiding duplication, and because CMS has disclaimed responsibility, manufacturers are left to devise a compliance plan themselves.[6]

The Government argues that HRSA is not responsible for anything IRA-related, pointing the finger at CMS.  Gov. Br. 23.  But both section 340B and the IRA place the obligation for complying with their provisions on *the Secretary*, a named defendant here, not one HHS subunit or another.  *See* 42 U.S.C. §§ 256b(a)(1), 1320f(a).  The Secretary cannot evade responsibility for

---

[5] *E.g.*, *Oregon Health & Sci. Univ. v. Engels*, 24-CV-2184 (RC) (D.D.C. filed July 24, 2024); *MaineGeneral Med. Ctr. v. Engels*, 24-CV-2187 (RC) (D.D.C. filed July 24, 2024); *University of Rochester v. Engels*, 24-CV-2268 (RC) (D.D.C. filed Aug. 1, 2024); *Children's Nat'l Med. Ctr. v. Engels*, 24-CV-2563 (RC) (D.D.C. filed Sept. 6, 2024); *University of Wash. Med. Ctr. v. Kennedy*, No. 24-CV-2998 (RC) (D.D.C. filed Oct. 22, 2024); *University of Kan. Hosp. Auth.*, No. 25-CV-549 (RC) (D.D.C. filed Feb. 24, 2025).

[6] CMS, *Medicare Drug Price Negotiation Program: Final Guidance, Implementation of Section 1191-1198 of the Social Security Act for Initial Price Applicability Year 2027 and Manufacturer Effectuation of the Maximum Fair Price in 2026 and 2027* 54–56 (Oct. 2, 2024) (CMS 2027 IRA Guidance), https://tinyurl.com/2exf63s3.

solving the legal problems his web of regulation creates, only to punish manufacturers for their good-faith efforts to comply with the laws. *See City of New York v. FCC*, 814 F.2d 720, 727 (D.C. Cir. 1987), *aff'd*, 486 U.S. 57 (1988) ("The FCC's refusal to enact technical standards . . . , combined with its policy of forbidding franchisors from doing so, seems to put franchisors in a 'Catch–22' position."). To implement the statutory guarantee of MFP-340B nonduplication, there must be data sufficient to determine the 340B status of each prescription, which CMS has admitted is not presently the case for the data pharmacies must submit to claim the MFP: "A dispensing entity may *voluntarily* apply [certain data] indicators to a Part D claim to indicate the claim is being billed for a 340B drug." CMS 2027 IRA Guidance, *supra* n.6, at 204 (emphasis added). The only practical way for BMS and Novartis to gather that data from covered entities and deduplicate 340B and MFP price concessions is through their proposed rebate models. For the Government to stand in the way of that effort now, with each component agency pointing its finger at the other, renders the statutory guarantee meaningless and defies rationality. For both reasons, HRSA's action is arbitrary and should be set aside.

The Government kicks the can down the road, complaining that "it would be premature to examine the Agency's review of the rebate model in relation to the" IRA because HRSA is still considering whether to exercise its self-appointed preapproval authority. Gov. Br. 21. There is nothing "premature" about Plaintiffs' challenge. HRSA made its statutory-interpretation position clear in letters to Plaintiffs. AR 292 (September 18, 2024 letter to Lilly); AR 342 (November 4, 2024 letter to BMS); AR 439 (January 14, 2025 letter to Novartis). The agency's response to Plaintiffs' proposed 340B models was consistent with its letters to other manufacturers, too. *See* AR 66 (August 14, 2024 letter to J&J); AR 424–425 (December 13, 2024 letter to Sanofi). Unsurprisingly, the Government does not argue its action is not final or this challenge unripe.

In those letters, HRSA explicitly threatened manufacturers with termination from the 340B Program—rendering the manufacturers' products ineligible for reimbursement by Medicaid and Medicare Part B—and crushing civil monetary penalties if they did not yield to HRSA's claimed preapproval power.  AR 214, 425; *see Center for Auto Safety v. National Highway Traffic Safety Admin.*, 452 F.3d 798, 807 (D.C. Cir. 2006).  The Government's brief makes clear that is a universal threat against Plaintiffs.  Gov. Br. 3–4 ("Manufacturers that do not comply with the terms of the pricing agreement . . . can be subject to termination from the 340B Program and civil monetary sanctions.") (citing 42 U.S.C. § 256b(d)(1)(B)(vi)).  And if HRSA's letters to manufacturers and the Government's brief were not clear enough, its website removes any doubt about its legal position: "[I]mplementing a rebate proposal without Secretarial approval would violate Section 340B(a)(1) of the Public Health Service Act."  HRSA, *340B Drug Pricing Program* (last updated Jan. 2025), https://www.hrsa.gov/opa.  HRSA has "publicly articulate[d]" its "unequivocal position," *Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 436 (D.C. Cir. 1986), and it expects manufacturers to "change their behavior," *Pharmaceutical Rsch. & Mfrs. of Am. v. HHS*, 138 F. Supp. 3d 31, 44 (D.D.C. 2015)—or else.  Together, these agency actions determine Plaintiffs' "rights or obligations"—by purporting to eliminate Plaintiffs' right to effectuate their 340B models—and "legal consequences"—in the form of civil monetary penalties and termination from the 340B Program— "will flow" from the agency's expressed position.  *Bennett v. Spear*, 520 U.S. 154, 177–178 (1997).

Moreover, the IRA's MFP deadline is imminent.  This problem is not a theoretical one for BMS and Novartis.  HHS selected BMS's drug ELIQUIS® and Novartis's drug ENTRESTO® for the Drug Price Negotiation Program and imposed an MFP on them beginning on January 1, 2026. CMS, *Medicare Drug Price Negotiation Program: Negotiated Prices for Initial Price Applicability Year 2026*, at 2 (Aug. 2024) (IPAY 2026 Results), https://www.cms.gov/files/document/fact-sheet-negotiated-prices-initial-price-applicabilityyear2026.pdf; *see* AR 330.  BMS and Novartis must

therefore provide CMS with a written "plan for making the MFP available" for ELIQUIS and EN-TRESTO, called an MFP effectuation plan, by September 1, 2025.  CMS 2027 IRA Guidance, *supra* n.6, at 285; AR 330.

That is why the Government's reference to CMS's "credit/debit leger system" is no answer to this problem.  Gov. Br. 23.  That system would depend on a manufacturer actually being able to access the claims data that would enable the drugmaker to link a particular prescription to claims for both MFPs and 340B pricing.  *See* CMS 2027 IRA Guidance, *supra* n.6, at 220–21.  The Government argues that this system can address erroneous price reductions even after the 14-day deadline for providing access to MFPs, Gov. Br. 23, but that remedy unjustifiably assumes manufacturers can *ever* get the necessary data.  Under the product-replenishment model, they typically do not.  No. 25-CV-117, ECF No. 12-2 ¶ 14.  BMS and Novartis explained these flaws in their opening briefs.  *See* BMS Opening Br. 38; Novartis Opening Br. 34.  The Government has no response; it just repeats the bare, disproven assertion that the existing credit-debit process is a solution.

Because HRSA's position thwarts Plaintiffs' 340B models while CMS simultaneously refuses to fulfill the IRA's promise of "[n]onduplication with 340B ceiling price[s]," *contra* 42 U.S.C. §§ 1320f(a)(2), 1320f-2(d), Plaintiffs have no other recourse but these lawsuits.  *See Barrick Goldstrike Mines Inc. v. Browner*, 215 F.3d 45, 49 (D.C. Cir. 2000) (finding claim ripe where challenger's "only alternative to obtaining judicial review . . . [was] to violate [the agency's] directives, . . . and then defend an enforcement proceeding on the [same] grounds"); *see also Pharmaceutical Rsch. & Mfrs. of Am.*, 138 F. Supp. at 42 n.7 (concluding challenge is ripe where "the Interpretive Rule presents a purely legal question of statutory interpretation" and "the rule also poses a 'hardship to the parties of withholding court consideration' ") (quoting *National Park Hospitality Ass'n v. Department of Interior*, 538 U.S. 803, 808 (2003)).  Far from being "premature,"

Plaintiffs' lawsuits are both timely and necessary in order to effectuate the IRA's MFP-340B non-duplication entitlement. *See CSI Aviation Servs., Inc. v. Department of Transp.*, 637 F.3d 408, 412 (D.C. Cir. 2011) (concluding challenge was not "premature" where the "DOT ha[d] issued a 'definitive' statement of the agency's legal position" in "[i]ts initial warning letter," which "took the position that air charter brokers under GSA contract require agency certification").

### E.    HRSA Has No Solution For The Program-Integrity Problems Of The Current System And No Answer For The Benefits Of Plaintiffs' Models.

HRSA refused to consider the operational and program-integrity rationales supporting Plaintiffs' intended rebate models, their commonsense benefits, and comparative advantages over the product-replenishment model. In defense of that decision, the Government repeats a now-familiar refrain: If HRSA has not considered all aspects of the problem, that is only because the agency has declined to either approve or disapprove Plaintiffs' models. Gov. Br. 18.

That is wrong. For one, that supposed non-position is a denial of Plaintiffs' models, which HRSA has now made abundantly clear. *E.g.*, Gov. Br. 18–19. And the threadbare explanation that HRSA provided here does not clear the APA's minimum standard of reasonableness. The agency never engaged with Plaintiffs' arguments explaining how the cash-rebate model will reanimate core protections Congress built into the 340B statute. AR 295, 298, 325–330. Nowhere, for example, did HRSA grapple with the practical benefits of Plaintiffs' models that address the worst shortcomings of the product-replenishment model or identify any harms that could offset those benefits. *E.g.*, AR 58–60, 274–275. The agency's mandate to engage in reasoned decisionmaking means it must not ignore Plaintiffs' explanation of the unlawful operation of the product-replenishment model that Plaintiffs have identified, or disregard Plaintiffs' arguments that their intended rebate models would permit meaningful oversight of both duplicate discounting and diversion of 340B

medicines.  An agency must "respond meaningfully to the arguments raised before it."  *New England Power Generators Ass'n, Inc. v. FERC*, 881 F.3d 202, 210 (D.C. Cir. 2018) (citation omitted).  HRSA did not.

## III.    HRSA'S REFUSAL TO APPROVE BMS AND NOVARTIS'S MODELS DENIES THEM DUE PROCESS OF LAW.

Congress charged HHS's Secretary to oversee both the 340B Program and the IRA's Drug Price Negotiation Program.  42 U.S.C. §§ 256b(a)(1), 1320f(a).  In the 340B Program, the Secretary is supposed to help "prevent . . . violations of the duplicate discount provision and other [compliance] requirements."  *Id.* § 256b(d)(2)(A).  In the IRA's Drug Price Negotiation Program, the Secretary should act "in accordance with section 1320f-2," *id.* § 1320f(a)(2), which contains the requirement of "nonduplication with [the] 340B ceiling price," *id.* § 1320f-2(d) (capitalization altered).  When the Secretary nevertheless facilitates improper 340B pricing, manufacturers lose revenue in ways forbidden by Congress.  That is the problem at the heart of BMS's and Novartis's due-process claims:  Unlawful duplication and other improper 340B claims are erroneous deprivations of BMS's and Novartis's property, and by adopting contradictory positions and frustrating manufacturers' efforts to correct the 340B Program's rampant abuses, HHS has guaranteed that these deprivations will not just continue, but accelerate.

The Government first tries to brush off these claims as "artful pleading efforts" that duplicate Plaintiffs' APA claims.  Gov. Br. 25–26.  That framing is mistaken.  True, the Court need not address BMS's and Novartis's due-process claims if it rules in their favor on the APA claims.  *See, e.g.*, *Window Covering Mfrs. Ass'n v. Consumer Prod. Safety Comm'n*, 82 F.4th 1273, 1293 (D.C. Cir. 2023) (declining to address a constitutional claim after concluding that an agency rule must be vacated).  But that does not make the claims identical.  BMS's and Novartis's due-process claims go beyond any one narrow action or policy, focusing instead on the aggregate effect of the way

HHS has discharged its oversight. In other words, these claims foreclose any attempt by HHS to deflect blame among its component agencies, creating a shapeshifting and effectively unchallengeable policy. *See* No. 24-CV-3337, ECF No. 1 ¶ 107 (challenging "HHS's siloed administration of the DPNP and the 340B Program"); No. 25-CV-117, ECF No. 1 ¶ 135 (challenging HHS's use of two subcomponents to impose "irreconcilable . . . demands that Novartis cannot simultaneously meet"); *contra* Gov. Br. 23 ("The Negotiation Program and the 340B Program are separate programs, created by separate statutes and administered by separate agencies."). At bottom, HHS may not deprive BMS and Novartis of property without due process regardless of the means it uses to do so.

The Government also implies that BMS and Novartis are somehow trying to "avoid the strictures Congress imposed on APA litigation." Gov. Br. 25–26. Yet it fails to identify any "strictures" relevant here. In the case the Government cites, the court assumed without deciding that where APA claims are barred under the adequate-alternative-remedy provision of 5 U.S.C. § 704, constitutional claims "premised on the same" facts are also barred. *Vietnam Veterans of Am. v. Shinseki*, 599 F.3d 654, 660 (D.C. Cir. 2010).[7] But BMS and Novartis have no adequate alternative remedy here—and the Government does not contend otherwise. The Government has not provided any reason to avoid reaching the merits of BMS's and Novartis's claims.

### A.    The Government's Position Deprives Plaintiffs Of Property Interests In Their Medicines.

Improper 340B pricing deprives BMS and Novartis of property in a straightforward way: An innovative medicine is a valuable product arising from years of research and development and

---

[7]  HHS also cites *Chiayu Chang v. USCIS*, 254 F. Supp. 3d 160 (D.D.C. 2017), but it is unclear why. Gov. Br. 26. That decision was about whether the plaintiffs could take discovery rather than supplement the administrative record. *Chiayu Chang*, 254 F. Supp. 3d at 161. It has nothing to do with assessing the merits of due-process claims asserted along aside APA claims.

many millions—sometimes billions—of dollars invested. *See* Michael Schlander *et al.*, *How Much Does It Cost to Research and Develop a New Drug? A Systematic Review and Assessment*, 39 PharmacoEconomics 1243, 1264 (Aug. 9, 2021), https://tinyurl.com/mfhu3wtf. Those products are usually protected by patents and other statutory exclusivities.[8] The ability to benefit from those exclusivities is a protected property interest, *Horne v. Department of Agric.*, 576 U.S. 350, 358–361 (2015), as is the freedom to decide the terms on which any sales of those products occur, *see Palestine Info. Off. v. Shultz*, 853 F.2d 932, 942 (D.C. Cir. 1988) (describing an "order[ ] by the government to . . . sell off . . . property"). By the same token, restrictions on these property rights that reduce the property's value are deprivations of these rights. *See, e.g.*, *Connecticut v. Doehr*, 501 U.S. 1, 11 (1991) (finding a deprivation through a measure that "impair[ed] the ability to sell or otherwise alienate the property"). Improper 340B pricing makes BMS and Novartis's medicines less valuable because it means they must be sold at prices far below their market value, on terms Plaintiffs would never choose.

BMS and Novartis are affected in a second way, too. When the government sets prices by law, it creates a protected property interest in receiving *at least* those prices. *See Rock River Health Care, LLC v. Eagleson*, 14 F.4th 768, 774 (7th Cir. 2021); *Furlong v. Shalala*, 156 F.3d 384, 393 (2d Cir. 1998). Both the 340B Program and the IRA's Drug Price Negotiation Program set maximum prices manufacturers may charge in certain circumstances. 42 U.S.C. § 256b(a)(1)–(2); IPAY 2026 Results, *supra* p. 20, at 2 (imposing MFPs on BMS's ELIQUIS and Novartis's ENTRESTO). Those government-set prices are limited by statutory eligibility and nonduplication requirements.

---

[8] *See, e.g.*, 21 U.S.C. §§ 355(c)(3)(E)(ii), (j)(5)(F)(ii) (five years exclusivity for new chemical entities not previously approved by the FDA); *id.* § 355(c)(3)(E)(iii)–(iv), (j)(5)(F)(iii)–(iv) (three years exclusivity to reward additional clinical testing for new indications or to develop new dosages); *id.* § 355a (six months additional exclusivity for pediatric clinical testing); *id.* § 360cc (seven years exclusivity for "orphan drugs" used to treat rare diseases).

42 U.S.C. §§ 256b(a)(1), 256b(a)(4)–(5), 1320f-2(a)(1), 1320f-2(d).  So when manufacturers are forced to provide discounts not required by law, they effectively receive prices below statutory rates for their products, resulting in another deprivation of a protected interest.[9]

The Government resists these conclusions by claiming that Plaintiffs are not being "forced" to offer improper 340B pricing.  Gov. Br. 28, 30.  But of course they are.  To name only one example, Medicaid Drug Rebate Program (MDRP)-340B duplication is so common that some analysts estimate that up to 5 percent of all Medicaid rebates duplicate 340B pricing.  Mundra, *supra* n.4.  The federal government has repeatedly identified the same problem.  *E.g.*, 2020 GAO Report, *supra* n.4, at 14; 340B Review, *supra* n.4, at 36–37.  HHS cannot claim that BMS and Novartis are *choosing* to incur these unlawful losses.  The product-replenishment model is responsible for these harms—which will only get worse after IRA pricing takes effect.  HHS cannot evade responsibility for the obvious, well-documented consequences of its actions by pointing out that it did not directly order those results.  *See Wood v. Ostrander*, 879 F.2d 583, 587 (9th Cir. 1989) (collecting cases rejecting the premise that "only intentional misconduct will suffice" as a deprivation).

The Government also makes a passing attempt to reduce BMS's and Novartis's claims to the ability "to effectuate 340B price reductions through cash rebates" *itself*.  Gov. Br. 27.  That point misconstrues BMS's and Novartis's position.  The companies are not arguing that the Constitution directly protects the way they wish to implement 340B pricing; they are arguing that their models are the only feasible way to stop the bleeding from unlawful price reductions that are diminishing their constitutionally protected interests in their medicines—bleeding that HHS has, for years, allowed to continue.  BMS Opening Br. 42–44; Novartis Opening Br. 40.

---

[9]  BMS and Novartis disagree that these price controls are themselves lawful.  But even setting aside that question, BMS and Novartis have a protected interest in not receiving *even lower* prices than these programs already demand.

The Government's final effort to deny that manufacturers are being deprived of property is to repeat that manufacturers have brought these problems on themselves by choosing to participate in the 340B Program. *See* Gov. Br. 2–3, 29, 30. If manufacturers were to withdraw from the program as HHS suggests, their products would become ineligible for federal reimbursement under Medicaid and Medicare Part B. 42 U.S.C. § 1396r-8(a)(1), (5)(A). Those programs provide huge amounts of revenue that manufacturers cannot afford to forgo.[10] That is by design. "The federal government dominates the healthcare market" and "uses that market power to get drug makers to subsidize healthcare." *Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696, 699 (3d Cir. 2023). In other words, the Government has occupied so much of the market that its supposed conditions for doing business are, in effect, orders. And this is for non-financial reasons as well: If manufacturers withdrew from all these programs, many of the nation's most vulnerable patients would lose access to lifechanging medicines—an unacceptable result. No. 25-CV-117, ECF No. 12-2 ¶ 36.

The D.C. Circuit recently explained why this sort of gunboat diplomacy cannot be recast as an arm's-length deal. When a book publisher contested a statutory requirement that it forfeit some of its products to the Copyright Office, the Government argued the mandate was "part of a voluntary exchange" for "copyright protection" and could therefore be avoided by forgoing that protection. *Valancourt Books, LLC v. Garland*, 82 F.4th 1222, 1235 (D.C. Cir. 2023). The D.C. Circuit disagreed, pointing out the lack of any "known and costless option" for making the trade. *Id.* "For an abandonment option to render" participation in a government program "a voluntary choice, the option would have to at least be cognizable to [property] owners." *Id.* Here, the supposed choice

---

[10]  *See* HHS, Office of the Assistant Secretary for Planning & Evaluation, *Medicare Part B Drugs: Trends in Spending & Utilization, 2008–2021* at 2–3, https://tinyurl.com/4u584fs2; CMS, *October 2024 Medicaid & CHIP Enrollment Data Highlights* (last updated Jan. 15, 2024), https://tinyurl.com/2jh6kbm4.

of exiting the 340B Program is not cognizable to manufacturers (and certainly not "costless") because it would harm or even destroy their businesses and impair public health. 340B administration that spawns more unlawful pricing abuses is not just an onerous term in a business proposal—it is a deprivation of Plaintiffs' property interests that they cannot avoid absent judicial relief.

### B.    HHS's Position Is Irrational And Gravely Unfair.

HHS is speaking out of both sides of its mouth through different subcomponents. To avoid unlawful IRA-340B duplication, CMS "strongly encourages manufacturers to work with dispensing entities, covered entities and their 340B TPAs" by "utilizing data available from covered entities and their 340B TPAs." CMS 2027 IRA Guidance, *supra* n.6, at 232. That is what BMS's and Novartis's models are designed to do: utilize claims data already collected by virtual-inventory systems and TPAs, *University of Wash. Med. Ctr. v. Kennedy*, No. 24-CV-2998 (RC) (D.D.C. Dec. 20, 2024), ECF No. 22-1 (Testoni Decl.) ¶¶ 6–7, so that providers can receive the right price at the right time. AR 274–275, 318–320, 433–435. By preventing implementation of those models, HRSA has forbidden BMS and Novartis to effectuate CMS's instructions. *See* AR 292, 342, 439. The result is two mutually incompatible directives, both from HHS—which will force manufacturers to offer price concessions forbidden by Congress. That is "legally irrational in that it is not sufficiently keyed to any legitimate state interests." *Committee of U.S. Citizens Living in Nicar. v. Reagan*, 859 F.2d 929, 943–944 (D.C. Cir. 1988) (quotation omitted and alteration adopted), *abrogation on other grounds recognized*, *Schieber v. United States*, 77 F.4th 806 (D.C. Cir. 2023).

HHS responds that it has forbidden BMS's and Novartis's models only "at this time," as if to suggest that it might change its mind before the companies must begin providing access to MFPs. Gov. Br. 26 (quoting AR 439). HHS has had *years* to address rebate models, and nearly eight months to consider this precise problem. *Supra* n.3; AR 59, 499. There is no more time. BMS and

Novartis must submit plans for effectuating MFPs by September 1, and they need substantial experience working with those models to inform those plans. CMS 2027 IRA Guidance, *supra* n.6, at 285; No. 24-CV-3337, ECF No. 12 ¶ 19; No. 25-CV-117, ECF No. 12-2 ¶ 30. HHS's irrational policy therefore has immediate consequences for BMS and Novartis: It is already hampering their ability to combat unlawful duplication once IRA price caps become effective in January.

To the extent the Government denies that unlawful MFP-340B duplication will occur under the status quo, it is mistaken. CMS's current guidance does not claim that current processes are sufficient to avoid MFP-340B duplication; CMS simply declined to "assume responsibility" for ensuring this. CMS 2027 IRA Guidance, *supra* n.6, at 230. Just this month, a former CMS official acknowledged that the agency's current processes "could lead to a rebate on a 340B claim in Medicaid, and potentially an MFP, being paid on a 340B claim." Cathy Kelly, *CMS May Engage in Medicare, 340B Discount Deduplication 'Eventually,' Ex-CMS Official Says*, Citeline Regulatory (Mar. 13, 2025), https://tinyurl.com/sbstjepm. The sticking point—as always under the product-replenishment model—is a lack of access to even basic claims data that would allow 340B-eligible transactions to be timely identified so that duplication can be avoided or corrected. *See id.*

Incredibly, the Government claims to have "addressed that issue by encouraging drug manufacturers to work with 340B covered entities and their third-party claims administrators to obtain the necessary information." Gov. Br. 24. That is precisely the basis of BMS's and Novartis's substantive-due-process claims: HHS has made it impossible for manufacturers to follow that instruction by threatening them with nuclear sanctions if they implement a model that is fundamentally an attempt to do exactly what CMS recommends. AR 203, 214, 424–425. And even the Government does not contend that covered entities will give this data out of the goodness of their hearts. Far from handing over their claims data voluntarily, covered entities often go to great lengths to avoid it—including by lobbying state legislatures to purport to forbid manufacturers to

require claims data *at all*. *See, e.g.*, William Newton, *Utah Becomes Tenth State to Enact 340B Contract Pharmacy Access Law After Governor Declines to Act on Bill*, 340B Report (Mar. 28, 2025) (noting that an association of covered entities "applauded the passage" of a new bill that attempts to do so), https://tinyurl.com/24dc5xxd.

The Government's position appears to be based on a misunderstanding of how BMS's and Novartis's models would function. It suggests as an alternative that manufacturers could exercise their "right to impose data-reporting conditions on 340B covered entities." Gov. Br. 24. But that is exactly what BMS's and Novartis's models do: condition 340B pricing on the prior receipt of claims data showing that a transaction is eligible for that price. AR 272–273 (explaining that Lilly's model requires covered entities to provide "basic, non-proprietary claims data"); AR 329–330 (explaining that BMS's model requires covered entities to "submit data . . . to demonstrate . . . eligibility for the 340B price"); AR 435 (explaining that Novartis's model requires covered entities to "submit data . . . to validate whether a given purchase is eligible for 340B pricing").

The Government does not reveal what kind of other "data-reporting conditions" it has in mind. Gov. Br. 24. But to the extent it argues manufacturers may not actually enforce those conditions by declining to provide 340B pricing for a particular unit until the conditions are satisfied, its position defies standard business practices. No. 25-CV-117, ECF No. 12-2 ¶ 27. A claim for 340B pricing is a request for a massive price reduction that, by law, is available only in specific circumstances. "Data-reporting conditions" that force manufacturers to offer 340B pricing regardless of whether providers offer even the most basic confirmation that they are complying with the 340B Program's statutory preconditions to receiving the 340B price would be self-evidently toothless and would be untethered to the way any legitimate business functions. *See id.* In any event, binding caselaw establishes manufacturers' right to insist on confirmation as a condition of extending the 340B price. *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 463 (D.C. Cir. 2024).

The Government also leans on the legal standard, pointing out that its decisions need not be "optimal," but only "rational."  Gov. Br. 28–29.  But HHS's conduct here fails to clear even that lowest of bars.  HHS talks in circles, telling manufacturers it has already addressed their concerns by "encouraging" them to act in ways it has simultaneously forbidden.  The bottom line is that HHS will neither help manufacturers avoid unlawful duplication nor allow manufacturers to help themselves.  BMS and Novartis thus face an impossible choice:  Comply with HRSA's demands, knowing that the result will be huge financial losses due to unlawful MFP-340B duplication.  Or pursue CMS's recommendation, getting necessary basic claims data by requiring covered entities to provide it before receiving 340B pricing for a unit—that is, a cash-rebate model—but only while risking civil monetary penalties and even termination from Medicaid and Medicare Part B.  AR 203, 214, 424–425.  That "grave[ly] unfair[ ]" bind amounts to "a deliberate flouting of the law that trammels significant . . . property rights."  *Silverman v. Barry*, 845 F.2d 1072, 1080 (D.C. Cir. 1988).

### C.    Novartis Has No Meaningful Opportunity To Be Heard Regarding Improper 340B Pricing.

Novartis's procedural-due-process claim is based on the lack of process afforded to Novartis to address individual instances of improper 340B pricing.  Novartis Opening Br. 40–41.  Novartis is erroneously deprived of those property interests when it is forced to offer price concessions forbidden by law, such as 340B pricing on ineligible transactions and MFP-340B and MDRP-340B duplication.  The Due Process Clause obliges HHS to institute "appropriate procedural safeguards" to ensure Novartis has a meaningful way to prevent such pricing errors, or at least to correct them after the fact.  *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985).

The Government attempts to dodge this claim entirely by recasting it as a challenge to HRSA's process for rejecting Novartis's cash-rebate model.  Gov. Br. 31–32.  That is simply a

misreading of Novartis's claim. The "opportunity" to repeat Novartis's request for HRSA to acknowledge Novartis's right to implement a cash-rebate model does nothing to help stem the tide of improper 340B pricing. What's needed is a mechanism for informing HRSA that covered entities have received 340B pricing they were not entitled to, and a robust way of holding such entities accountable. By invigorating existing procedures, Novartis's cash-rebate model would do just that.

It is no answer to point to any purportedly "available process." Gov. Br. 31. HHS must provide processes not just in the abstract, but ones that work in the real world and are effective enough to avoid errors. *See, e.g.*, *Propert v. District of Columbia*, 948 F.2d 1327, 1333–34 (D.C. Cir. 1991); *Thompson v. District of Columbia*, 832 F.3d 339, 345–346 (D.C. Cir. 2016); *Da'Vage v. D.C. Hous. Auth.*, 583 F. Supp. 3d 226, 238 (D.D.C. 2022). Novartis does not have that.

Take audits, for example. As Plaintiffs have repeatedly emphasized, access to audits depends on manufacturers' ability to first get "sufficient facts and evidence in support" of a claim that a covered entity has misused the 340B Program. 61 Fed. Reg. at 65,410. The Government insists this requirement can be surmounted, Gov. Br. 20, but its support for that proposition is less sweeping. The declaration the Government cites refers to only "18 manufacturer-conducted audits over the past *decade-plus*" and "37 instances" where HRSA authorized a "proposed work plan" over the same period—hardly a significant volume. Testoni Decl. ¶ 15 (emphasis added).

The additional process Novartis is proposing is, at bottom, to grant manufacturers access to basic claims data they should have had all along. *See* AR 435. Access to that data would strengthen the processes the Government identifies, including audits and the 340B credit-debit ledger system. No. 25-CV-117, ECF No. 12-2 ¶ 28. But more importantly, Novartis would have less of a need to use those remedial processes in the first place because it would have enough information "to stop MDRP-340B duplication before it happens" and to "make available (or not, as appropriate) IRA

MFPs correctly." *Id.*  Providers would receive the right prices at the right times.  In other words, Novartis is asking for pre-deprivation procedures that actually work.

Finally, Novartis's cash-rebate model is based on requiring standard claims data that covered entities already "collect, report, and maintain in the normal course of business."  AR 435.  The model therefore will not impose onerous requirements on covered entities while enhancing program integrity, leaving HHS with no "interest in avoiding [the] additional procedural safeguards."  *See Simms v. District of Columbia*, 872 F. Supp. 2d 90, 103 (D.D.C. 2012).  For its part, HRSA has previously (and correctly) treated the provision of "detailed and accurate . . . initial claim data" as a "standard business practice[ ]" that benefits all stakeholders, including covered entities.  63 Fed. Reg. at 35,241–42.  That is true here as well, and it shows that the additional guardrails Novartis is proposing are required given "the magnitude of the private interest at stake."  *Esparraguera v. Department of the Army*, 101 F.4th 28, 40 (D.C. Cir. 2024).

## CONCLUSION

For the foregoing reasons, and those in Plaintiffs' opening briefs, Plaintiffs' motions for summary judgment should be granted, and Defendants' cross-motion for summary judgment should be denied.

Dated: March 31, 2025     Respectfully submitted,

         */s/ Catherine E. Stetson*
         John C. O'Quinn
         Matthew S. Owen
         Megan McGlynn
         KIRKLAND & ELLIS LLP
         1301 Pennsylvania Avenue N.W.
         Washington, D.C. 20004
         (202) 389-5000
         john.oquinn@kirkland.com
         matt.owen@kirkland.com
         megan.mcglynn@kirkland.com

         Catherine E. Stetson (D.C. Bar No. 453221)
         Jacob T. Young (D.C. Bar No. 90014334)
         HOGAN LOVELLS US LLP
         555 Thirteenth Street N.W.
         Washington, D.C. 20004
         (202) 637-5600
         cate.stetson@hoganlovells.com
         jake.young@hoganlovells.com

         *Attorneys for Plaintiffs Eli Lilly and Company*
         *and Lilly USA, LLC*

         */s/ Sean Marotta*
         Sean Marotta (D.C. Bar No. 1006494)
         Marlan Golden (D.C. Bar No. 1673073)
         HOGAN LOVELLS US LLP
         555 Thirteenth Street, N.W.
         Washington, D.C. 20004
         Telephone: (202) 637-4881
         Facsimile: (202) 637-5910
         sean.marotta@hoganlovells.com

         *Attorneys for Plaintiff Bristol Myers*
         *Squibb Company*

/s/ Sean Marotta
Sean Marotta (D.C. Bar No. 1006494)
Jacob T. Young (D.C. Bar No. 90014334)
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-4881
sean.marotta@hoganlovells.com

*Attorneys for Plaintiff Novartis
Pharmaceuticals Corporation*